UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CAPITAL BRIDGE CO., LTD,

                             Plaintiff,

      -v-

IVL TECHNOLOGIES LTD., MEMCORP INC.,
AND CRAIG ELECTRONICS INC.

                            Defendants.

Case No. 04-CV-4002 (KMK)

OPINION AND ORDER

---

Appearances:

Anthony H. Handal, Esq.
Brown Rudnick, LLP
New York, NY
*Counsel for Plaintiff*

Daniel P. Burke, Esq.
Galgano & Burke, LLP
Hauppauge, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff, Capital Bridge Co., filed this patent infringement suit against Defendants IVL

Technologies, Ltd. ("IVL"), Memcorp, Inc., and Craig Electronics, Inc. ("Defendants"), claiming

patent infringement under 35 U.S.C. § 271.  Defendants move for summary judgment claiming

there is no genuine issue of material fact relating to infringement either literally or under the

doctrine of equivalents.  For the reasons stated herein, the motion is granted.

I.  Background

Plaintiff, which purports to be "organized under the laws of the state of New York,"

(Compl. ¶ 2) is the owner of U.S. Patent No. 6,025,553 ("the '553 patent") entitled Portable

Music Performance Device, which is a wireless, portable, hand-held karaoke device.  (Compl. ¶

8)  The invention allows users to select songs and musical accompaniment using a keypad on the

device and to wirelessly broadcast their voices along with the music to multiple FM receivers

that are tuned to the correct station.  *See* U.S. Patent No. 6,025,553 col.2. l.51-67, col.3 l.1-6

(mailed August 29, 1997) [hereinafter '553 Patent].  In the specification, Plaintiff explains that

the device was created to overcome the disadvantages of the typical karaoke system; including

the bulkiness and cost of the equipment, the need for wires, the inability to use the systems in

cars or outdoors, and the inability to have the performance amplified by multiple receivers in

different rooms.  *See* '553  Patent col.1.15 - col.2 l.37.

Defendant IVL manufactures T.V. Star Player and Disney Princess Karaoke and sells

them to national retailers and international distributors.  (Decl. of Brian Gibson in Supp. of

Summ. J. ¶ 4 ("Gibson Decl."))  Defendant Memcorp purchases Disney Princess Karaoke and

distributes the product to retailers.  (Gibson Decl. ¶ 4)  Defendant Craig Electronics

manufactures an industrial design of T.V. Star Player, under license from IVL, which is

electronically identical to IVL's device and uses custom component parts purchased from IVL.

(Gibson Decl. ¶ 4)  These devices constitute the accused devices.

The '553 patent consists of forty claims, including independent claims 1 and 22, which

are at issue in this case.  Claim 1 reads:  "a portable, self-contained hand-carried music

performance device for *wirelessly transmitting* musical accompaniment information stored in a

storage medium therein and a voice input from a user, for reception and reproduction by an

2

external receiver and speaker unit." '553 Patent col.10 l.27 (emphasis added).  Claim 22 reads:
"[a] portable, hand-carried music performance device capable of *transmitting wirelessly* both
musical accompaniment information stored therein in a storage medium and reproduction by an
external speaker unit."  *Id.* at col.13 l.6 (emphasis added).  The dependent claims in the '553
patent do not use the term wirelessly, however multiple claims refer to transmission through an
antenna.

The application process for the '553 patent involved multiple amendments to achieve
patentability.  Of particular concern for the Patent and Trademark Office ("PTO") was the prior
art established by the Takao patent, U.S. Patent No. 5,349,480, and the Mankovitz patent, U.S.
Patent No. 5,408,686.  The Takao patent taught a portable music performance device, but did not
disclose the transmission means.  (Decl. of Georgia Damoulakis in Supp. of Summ. J. Ex. B 332
("Damoulakis Decl."))  The PTO examiner believed that when Takao was combined with
Mankovitz, which teaches a means for transmitting human voice and musical accompaniment, a
person of ordinary skill could achieve Plaintiff's invention.  (Damoulakis Decl. Ex. B 333)  In
response to the PTO's rejection, Plaintiff first amended the claims to add "elements, other than a
transmitting means," that Plaintiff believed were not taught or suggested by Takao.  (Damoulakis
Decl. Ex. B 356)  In the first amendment, Plaintiff added details to claim 1 so that where the
claim once referred to "a portable music performance device," the claim was changed to "a
portable, self-contained hand-carried music performance device."  At this time there were only
21 patent claims.

The first amendment was rejected on the same grounds as the original application, and the
PTO again referred to additional patents that presented prior art issues.  (Damoulakis Decl. Ex. B
361)  Plaintiff then filed a second amendment explaining in the remarks that the claims were

amended and new claims were added "to more clearly set forth that which [Plaintiff] regards as the invention" and "to more clearly and thoroughly define the subject matter." (Damoulakis Decl. Ex. B 395) It was in this August 29, 1997 amendment that the opening clause of claim 1 was finally amended to read "[a] portable, self-contained hand-carried music performance device for wirelessly transmitting . . . ." (Damoulakis Decl. Ex. B 386) The final clause of claim 1 was also amended to read, a "transmitter disposed in said casing for wirelessly transmitting" instead of just a "means for transmitting." (Damoulakis Decl. Ex. B 387) Similarly, claim 22 was added to the patent application, referring to a device capable of transmitting wirelessly. (Damoulakis Decl. Ex. B 389) The August 29, 1997 amendment was made following an unrecorded conversation in approximately June 1997 between Plaintiff and the PTO, leaving the inference that the addition of "wireless" was a result of those conversations. (Damoulakis Decl. Ex. B 395)

Recently, Plaintiff has requested amendments to the '553 patent that would remove the term "wirelessly" from claim 1. However, the PTO has rejected early amendments and the latest application for amendment is pending with the PTO.[1]

---

[1] Plaintiff informed the Court in a May 19, 2006 letter that the PTO sent Plaintiff a Notice of Allowability for Plaintiff's requested amendment to the '553 patent. With the amendment, claim 1 would no longer include the word "wirelessly" and instead would read "music performance device for transmitting musical accompaniment information." However, claim 22 would remain the same and would continue to refer to "transmitting wirelessly." The dependent claims would also still pertain to transmission through an antenna. Plaintiff contends that this Notice of Allowability creates an issue of literal infringement, moots many of Defendants' arguments, and warrants denial of the Motion without prejudice. Plaintiff would like the Court to decide this Motion based on the patent changes for which Plaintiff received the Notice of Allowability or stay the proceeding during the pending amendment and reissue application. However, Plaintiff's argument fails for two reasons: 1) a Notice of Allowability is only one step in a reissued patent and 2) the cases Plaintiff cites are factually dissimilar.

Plaintiff refers to two district court cases. First, in *Novartis Corp. v. Dr. Reddy's Labs., Ltd.*, No. 04 Civ. 0757, 2004 WL 2368007 (S.D.N.Y. Oct. 21, 2004), the court granted the defendant's motion to stay the proceedings pending the FDA determination of whether the accused product infringed the plaintiff's patent or satisfied the standards for a generic drug that

Defendants' accused devices also serve as hand-held karaoke devices, however the devices do not use wireless transmission.  (Gibson Decl. ¶ 9)  In order to operate, the devices are connected by wires to a television.  (Gibson Decl. ¶ 5)  Also, the devices only send signals to a single receiver.  (Gibson Decl. ¶ 11)

---

would not infringe.  2004 WL 2368007, at *3.  The court reasoned that the FDA's decision would potentially moot the case.  *Id.*  Also, in *Bausch & Lomb Inc. v. Alcon Labs., Inc.*, 914 F. Supp. 951 (W.D.N.Y. 1996), the PTO had initiated an interference proceeding.  914 F. Supp. at 952.  The court stayed the infringement action because the purpose of the proceeding was to determine the validity of a patent as a whole.  *Id.*  Neither of these cases support staying the present Motion.

A Notice of Allowability is only the first step towards a patent being reissued.  Following the Notice of Allowability, the PTO also must send a Notice of Allowance, and following that Notice, the PTO will reissue the patent, which usually occurs some months later.  The amendment is considered pending until the patent is reissued.  Plaintiff has not received a Notice of Allowance and protests have been submitted to the PTO against the reissue.  Thus, the amendment is still pending and it is unknown when it will be adjudicated.  Although Plaintiff believes the PTO will reissue the patent in three to six months, this is mere speculation, especially given the long history of Plaintiff's reissue application.

In light of this, there is no reason to stay this case or delay resolution of the pending Motion.  First, the uncertain length of the delay contemplated by Plaintiff's request alone mandates that the case proceed.  *See Sampson v. Ampex Corp.*, 335 F. Supp. 242, 245 (S.D.N.Y. 1971) (denying the plaintiff's request "to withhold a decision while the plaintiff pursues possibly extensive, prolonged collateral remedies in the Patent Office" and granting defendant's motion for summary judgment).  Second, as noted in *Sampson,* if Plaintiff subsequently secures an amended patent from the PTO, Plaintiff's remedy is to institute a new lawsuit.  *Id.*  In fact, Congress has provided a specific procedure to address alleged infringers of reissued patents.  *See* 35 U.S.C. § 252.  If the patent is reissued, Plaintiff could avail himself of the statutory procedures outlined in § 252 to enforce his patent.  However, the procedure does not permit retroactive application of the new claims contained in the reissued patent.  *See BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993) ("The accused infringer may raise the defense of intervening rights only when none of the infringed claims of the reissue patent were present in the original patent.").  Thus, even if the PTO permits Plaintiff to amend, unlike those cited by Plaintiff, this case will not be moot.  Therefore, this case must be decided based on the patent as it currently stands and the Court cannot rely on the pending amendments.  *See Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-37 (Fed. Cir. 1991).

## II.  Discussion

### A.  Standard of Review

"Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The determination will be based on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any."  *Id.*  The burden of proof is on the movant to show no genuine dispute of fact and all inferences must be drawn in favor of the non-movant.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists."  *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003).  The genuine issue of material fact "is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); *see also Magan*, 339 F.3d at 161 (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir. 2003)); *see also Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### B.  Infringement Analysis

Infringement analysis is a two-step process.  First, as a question of law, the Court must determine the scope of the patent claims allegedly infringed by analyzing the claim construction through the use of intrinsic and extrinsic evidence.  *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1105 (Fed. Cir. 2000) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995)).  Second, the accused device must be compared to the properly

construed scope of the claim to determine if the accused device infringes the patent, either literally or through the doctrine of equivalents.  *Id.*

             1.  Claim Construction

      To determine the scope of a claim, the Court must first consider intrinsic evidence, including the actual language of the claim, the specification, and the prosecution history. *Markman*, 52 F.3d at 979.  The analysis should begin with the claims as "the claims of the patent provide the concise formal definition of the invention." *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).  In looking to the language of the claims, the words should be given their ordinary and customary meaning, which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," unless the patentee clearly indicates some other meaning in the patent specification or application history.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  However, the claims are to be interpreted not only in the context of the surrounding words, but also in the context of the entire patent, including the specification and the prosecution history, as they are the resources that an ordinary person skilled in the art would use to determine the scope of the patent.  *See Phillips*, 415 F.3d at 1313.

      The specification offers a written description of the invention that can "act as a sort of dictionary, which explains the invention and may define terms used in the claims."  *Markman*, 52 F.3d at 979.  The specification can also define terms by implication.  *See Bell Atlantic Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[T]he meaning [of the claims] may be found in or ascertained by a reading of the patent documents.") (internal citations omitted).  Although specifications aid in determining the scope of the claim,

they cannot be used to read additional limitations into the claim. *E.I. du Pont de Nemours*, 849 F.2d at 1433.

The prosecution history can further elucidate the true meaning of the claim as it "provides evidence of how the PTO and the inventor understood the patent" and also "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Vitronics*, 90 F.3d at 1582; *Markman*, 52 F.3d at 980. However, because it represents an "ongoing negotiation between the PTO and the applicant . . . it often lacks the clarity of the specification." *Id.* Nonetheless, both the specification and the prosecution history can serve as tools for interpreting the claims.

If, and only if, any ambiguity remains after reviewing all intrinsic evidence, a court can then consider extrinsic evidence, such as expert testimony, treatises, and dictionaries. *See Vitronics*, 90 F.3d at 1583. Expert testimony can provide background on the technology and the invention. However, a court should not rely on conclusory, unsupported testimony and should "discount any expert testimony that is clearly at odds with the claim construction mandated" by the intrinsic evidence. *Phillips*, 415 F.3d at 1318 (internal citations omitted) (citing *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)). Although there is "no magic formula or catechism for claim construction[,]" through the use of intrinsic evidence, and extrinsic evidence when necessary, the Court can correctly construe the claim scope as a person with ordinary skill in the art would understand the claim. *Phillips*, 415 F.3d at 1324.

        2.  Claim Construction for the '553 Patent

The patent consists of forty claims, including independent claims 1 and 22, which are the focus of this motion. Claim 1 sets forth "[a] portable, self-contained hand-carried music performance device for *wirelessly transmitting* musical accompaniment information stored in a

storage medium therein and a voice input from a user, for reception and reproduction by an external receiver and speaker unit." '553 Patent col.10 l.27 (emphasis added). Similarly, claim 22 describes "[a] portable, hand-carried music performance device capable of *transmitting wirelessly* both musical accompaniment information stored therein in a storage medium and reproduction by an external speaker unit." *Id.* at col.13 l.6 (emphasis added). The critical language of these two independent claims for this motion is "wirelessly transmitting" and "transmitting wirelessly." The issue to be resolved is if and how the use of the term "wirelessly" limits the scope of the patent.

<u>a. Plain Language of the Claims</u>

Both parties agree that the ordinary and customary meaning of the word wireless to someone skilled in the art is "without a wire." "Each element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). The Court, therefore, must give heed to the use of the term "wirelessly."

In the opening clause of both claims 1 and 22, the patent explains that the device wirelessly transmits information. While the focus of the dispute has been the first clauses of these claims, other clauses in both claims also refer to wireless transmission. Indeed, neither claim refers to the transmission process without including the wireless element. Courts can look to other clauses in the claims in question to inform their construction of the claim element "and further define the functions attributed to it by the patentee." *Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998). Plaintiff's repeated and consistent reference to "wireless transmission," as opposed to "transmission" generally or "wired transmission," throughout claims 1 and 22 shows that Plaintiff understood the patent was for a

device that "transmitted wirelessly."  *See id.* ("A word or phrase used consistently throughout a patent claim should be interpreted consistently.").  Thus "wireless transmission" is an element of the claim that limits the scope of the patent.

Further support for limiting the scope to wireless transmission can be found in the dependent claims, which describe the transmission process.  *See Phillips*, 415 F.3d at 1313 (holding that claim construction requires interpretation in light of entire patent, including dependent claims).  All of the dependent claims that describe the transmission process from the device to the FM receivers refer to transmission through an antenna.[2]  As an antenna is only necessary for wireless transmission, this repeated description of transmission through an antenna further supports a finding that the scope of the claim is limited to wireless transmission.  Thus, the plain language of the claims 1 and 22 in the context of the entire patent indicates that the patent is limited to wireless transmission.

### b.  Specification

The specification serves as additional support for a finding that the patent scope is limited to wireless transmission.  *See Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 386 F. Supp. 2d 526, 534 (S.D.N.Y. 2005) (finding that analysis of the specification supported conclusion that claim included eyeglasses with rims).  First, in distinguishing the invention from prior art, the specification discusses the disadvantages of the comparative karaoke systems.  Within the list of disadvantages such as the size and expense, Plaintiff describes the need for many wire connections, which causes users to be constrained to certain locations.  The specification goes on to say that the invention overcomes the disadvantages of the typical karaoke system.  The

---

[2] See dependent claim 12 at '553 Patent col.11 l.35, claim 15 at col.12 l.7, claim 18 at col.12 l.49, claim 19 at col.12 l.56, claim 20 at col.12 l.63, claim 32 at col.14 l.8, claim 35 at col.14 l.44, claim 39 at col.16 l.8, and claim 40 at col.16 l.15.  The terminology varies from "an antenna for transmitting" to "transmission through the antenna."

invention, through wireless transmission, allows users to be mobile – taking and performing their karaoke in any location where a FM receiver is properly tuned.  As Plaintiff distinguishes prior art, in part, on the use of wires, the claim should not now be read so broadly as to cover the very aspects of prior art Plaintiff relied on to distinguish the invention.  *See, e.g., Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1194 (Fed. Cir. 2005) (holding that the court's construal of the term "mounted on" to mean "fastened into position" based on the ordinary meaning of mounted and rejection of the plaintiff's definition of being electrically connected was supported by the fact that "on occasion the patent distinguishes between features that are 'mounted on' an object and those that are 'connected to' or 'in electrical communication with'"); *see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he SciMed patents distinguish the prior art on the basis of the use of dual lumens and point out the advantages of coaxial lumens used in the catheters that are the subjects of the SciMed patents. That discussion in the written description supports the district court's conclusion that the claims should not be read so broadly as to encompass the distinguished prior art structure [of dual lumens].").

Second, in describing the embodiment of the device, the specification does not explicitly discuss the use of wires in the invention, or the lack thereof.  The specification, however, outlines in multiple places the use of an antenna for transmitting the music and human voice to common FM receivers.  *See* '553 Patent col.5 l.61, col.6 l.19, col.7 l.64.  This is material to the analysis. *See Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000) (holding where "[t]he specification only describes one method" of achieving an element of the claim, "the specification actually limits the invention to structures that utilize [that method,]" even if a person of ordinary skill would be aware of other methods for achieving the claim element).  Again this indicates that the

scope of the invention, and Plaintiff's understanding of the scope, was that transmission was

wireless.  *See SciMed Life Sys.*, 242 F.3d at 1344 ("[T]he written description can provide

guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to

be construed, even if the guidance is not provided in explicit definitional format.");

*Phonometrics*, 133 F.3d at 1459; *Gen Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 769-

70 (Fed. Cir. 1996); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1577-78 (Fed.

Cir. 1993); *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559,

1566-67 (Fed. Cir. 1992).

Finally, in discussing the steps required for performance, the specification only explains

that FM receivers need to be tuned to the correct frequency and adjusted to the proper volume.

'553 Patent col.8 l.20.  Nowhere does the specification explain that the device needs to be wired

or physically connected to a receiver.  For the above reasons, the specification confirms a

construction of the patent that would limit the scope to wireless transmission.

### c.  Prosecution History

The '553 Patent's prosecution history does not specifically discuss the inclusion of

"wirelessly transmitting," but it nonetheless offers insight into why the term was added to the

patent claims.  The patent application was twice rejected and amended on the grounds of prior art

in the form of the Takao and Mankovitz patents.  The PTO explained that the Takao and

Mankovitz patents, when considered together, teach the technology used for Plaintiff's invention.

(Damoulakis Decl. Ex. B 333)  The Takao patent discussed portable devices and the Mankovitz

patent discussed transmission means.  In Plaintiff's response to the first rejection, Plaintiff

commented that the invention was more complex than the prior art.  (Damoulakis Decl. Ex. B

350)  Plaintiff added elements and details in each of the amendments to distinguish the invention

from prior art and to describe more clearly the subject matter of the invention.  (Damoulakis

Decl. Ex. B 348, 395)  In the first amendment, Plaintiff included more details of the invention

such as the hand-held and self-contained features, but did not elucidate the "means for

transmitting."  (Damoulakis Decl. Ex. B 343)  These changes, however, were not sufficient to

avoid obviousness based on prior art.  (Damoulakis Decl. Ex. B 361)

 In the final amendment, Plaintiff added the term "wirelessly" to the first and last clauses

of claim 1 and introduced claim 22, which describes wireless transmission.  While additional

changes were made to the patent unrelated to transmission in the second amendment, the Court

can nevertheless determine that including the word "wirelessly" was part of Plaintiff's goal to

define more clearly the invention in order to achieve patentability.  *See Phillips*, 415 F.3d at

1317.  Plaintiff has given no other reason for making the amendments in the remarks.  Thus

"wirelessly transmitting," as opposed to transmitting generally, was an important detail in

achieving patentability.  Further, in a declaration submitted during the application process, the

Vice President of NAS Electronics, Inc., then the assignee of the device, stated that the device

was acclaimed as the "first wireless, hand-held microphone."  (Damoulakis Decl. Ex. B 399)

Based on the foregoing prosecution history, it is apparent that Plaintiff intended to patent a

device that specifically transmitted signals wirelessly from the device to a remote receiver.

 Plaintiff contends in his opposition papers and at oral argument that the purpose of the

inclusion of "wirelessly" was to broaden the scope of claim 1, which originally was limited to RF

signals capable of being received only by radio receivers.  According to Plaintiff, the addition of

"wirelessly" broadened the claim to permit signal receivers other than radios, such as televisions.

 Plaintiff mischaracterizes the amendments and their effects on the patent scope.  While

the amendment did broaden the means of *reception*, it simultaneously narrowed the means of

*transmission*.  On the one hand, the original claim only described the transmission and reception process in one clause, stating a "means for transmitting . . . as an RF signal capable of being received by a radio receiver."  (Damoulakis Decl. Ex. B 343)  The amended claim, on the other hand, describes the transmission and reception in both the first and last clauses of claim 1.  The first clause describes a "device for wirelessly transmitting . . . for reception and reproduction by an external receiver."  '553 Patent, col.10 l.28-30.  The last clause of claim 1 describes a transmitter "for wirelessly transmitting . . . an RF signal capable of being received and reproduced by said external receiver."  '553 Patent, col.10 l.64-7.  Thus the first half of the clauses, in both the original and final versions of claim 1, outlines the transmission means and the latter half of the clauses outlines the reception means.  Plaintiff blurs the clauses, using the language in the first half, which describes transmission, to support his argument about the second half, which involves reception.

Put another way, prior to the introduction of the term "wirelessly," the '553 patent could have been read to cover both wired and wireless transmission.  Plaintiff added the phrase "wirelessly transmitting," thereby narrowing the scope from transmission generally to wireless transmission specifically.  Even if the amendments broadened the second half of the clause so that the device could receive more than just RF signals, the change to the first half of these clauses limited the means of transmission to wireless.  Therefore, Plaintiff's interpretation of the prosecution history fails.[3]

---

[3] On August 9, 2006, Plaintiff submitted an unsolicited letter to the Court seeking to supplement the August 8, 2006 oral argument regarding the addition of the word "wirelessly." Plaintiff did not seek or receive permission from the Court and the Court will not consider the letter.  Thereafter, on August 18, 2006, Plaintiff filed a Motion for Leave to File Letter Corroborating Information and Argument of Record or, in the Alternative, for a Telephone or Court Continuation of the Oral Argument.  Plaintiff has had ample time since the filing of this Motion to seek leave to submit such a letter or to supplement the record.  The Court will not entertain additional submissions or argument.  In any event, it does not matter why Plaintiff

Together, the language of the patent claims, the specification, and the prosecution history require a construction of the patent that is limited in scope by the element of wireless transmission.  It is not necessary for the Court to look to extrinsic evidence as no ambiguity remains following review of the intrinsic evidence.  Based on this limitation, the Court must now compare the patent claims to Defendants' allegedly infringing devices to determine if wired transmission is equivalent to wireless transmission.

### 3.  Comparison of An Accused Device to a Properly Construed Claim

#### a.  Literal Infringement

When an accused device clearly falls within the words of the claim, the device is said to literally infringe on the invention.  *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607 (1950).  For literal infringement, the accused device must literally contain each element of the claim.  *Id.*

#### b.  Doctrine of Equivalents

An accused device does not need to copy every literal detail of the patented invention to infringe.  *Festo Corp. v. Shokestsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 727 (2002).  The doctrine of equivalents was developed "to temper unsparing logic and prevent an infringer from stealing the benefit of the invention" by making insubstantial changes to avoid literal infringement.  *Graver Tank*, 339 U.S. at 608 (citing *Royal Typewriter Co. v. Remington Rand*, 168 F.2d 691, 692 (2d Cir. 1948)); *see also Festo Corp.*, 535 U.S. at 727.  The doctrine can be invoked when a device "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention.  *Graver Tank*, 339 U.S. at 608 (citing

---

added the term "wirelessly" to the patent, because as noted below, prosecution history estoppel is not necessary to decide this Motion.  The claim says what it says, and does so plainly and clearly.

*Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42 (1928)); *see also Warner-Jenkinson*, 520 U.S. at 40.  However, "[w]here the evidence is such that no reasonable jury could determine the two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment."  *Warner-Jenkinson*, 520 U.S. at 39 n.8.

"Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum."  *Graver Tank*, 339 U.S. at 609; *see also Warner-Jenkinson*, 520 U.S. at 39-40; *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1359 (Fed. Cir. 2005). However, because "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention . . . the doctrine of equivalents must be applied to the individual elements of the claim, not to the invention as a whole."  *Warner-Jenkinson*, 520 U.S. at 29. There are two limitations to the doctrine of equivalents which serve as defenses to infringement. *Id.* at 40.  These limitations prevent "conflicts with the definitional and public-notice functions of the statutory claiming requirements."  *Id.* at 29.  First, in applying the doctrine to an element of the claim, a court must be sure that the doctrine "is not allowed such broad play as to effectively eliminate that element in its entirety."  *Id.*  This limitation, known as the "all elements rule," ensures that the doctrine "will not vitiate the central functions of the patent claims themselves." *Id.* at 30.  Second, prosecution history estoppel serves as a limitation by narrowing the scope of the patent based on amendments made during the application process.  *Id.*

### i.  All Elements Rule

"There can be no infringement under the doctrine of equivalents if even one element of a claim or its equivalent is not present in the accused device."  *Bell Atlantic*, 262 F.3d at 1279.  As each element is deemed material to the claim, "if the court determines that a finding of infringement would entirely vitiate a particular claim element" the doctrine of equivalents cannot

apply.  *Id.*  In assessing the equivalence of elements, the Supreme Court has observed that "[a]n

analysis of the role played by each element in the context of the specific patent claim will thus

inform the inquiry as to whether a substitute element matches the function, way, and result of the

claimed element, or whether the substitute element plays a role substantially different from the

claimed element."  *Warner-Jenkinson*, 520 U.S. at 40.

In addition, a corollary to the "all elements rule" is the "specific exclusion principle."  By

this principle, when the "scope of the claim [is] limited in a way that plainly and necessarily

exclude[s] a structural feature that [is] the opposite of the one recited in the claim, that different

structure [can]not be brought within the scope of the patent protection through the doctrine of

equivalents."  *SciMed Life Sys.*, 242 F.3d at 1347 (stating as an example that if a claim has an

element of non-metallic, "the patentee cannot assert the patent against a metallic device on the

ground that a metallic device is equivalent to a non-metallic device").  For instance, in *Velcro

Indus. v. Taiwan Paiho*, No. 04 Civ. 242, 2005 WL 2739089 (D.N.H. Oct. 13, 2005), the court

had to determine whether a patent claim that described hooks extending in opposite directions

covered an accused device that had hooks extending in the same direction.  2005 WL 2739089, at

*2.  The court held that the patent was limited to hooks extending in opposite directions.  *Id.*

Given this claim construction, the claim necessarily excluded hooks extending in the same

direction because the opposite of "opposite" is "same."  *Id.*  This principle was also employed in

*Moore*, where the patent claim covered strips of adhesive that "extend a majority of the lengths

of the longitudinal margins," but the accused device's adhesive only extended a minority of the

lengths.  229 F.3d at 1105.  The patent holder argued that the use of the term majority was a

matter of degree and did not amount to a structural limitation.  *Id.*  The court, in rejecting this

argument, held that allowing minority to be an equivalent to majority would vitiate the

requirement.  *Id.*  Also, "it would defy logic to conclude that a minority – the very antithesis of a majority – could be insubstantially different from a claim limitation requiring a majority, and no reasonable juror could find otherwise."  *Id.* at 1106.

### ii.  Prosecution History Estoppel

Prosecution history estoppel is an alternative defense to infringement from the all elements rule.  When a patentee amends the patent application in a way that narrows the claims of the patent, "prosecution history estops him from later arguing that the subject matter covered by the original, broader claim was nothing more than equivalent."  *Festo*, 535 U.S. at 727.  "Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope."  *Id.* at 737.  However, "a narrowing amendment should [not] be deemed to relinquish equivalents unforeseeable at the time of the amendment."  *Id.* at 738.  Nor should it "foreclose claims of equivalence for aspects of the invention that have only a peripheral relation to the reason the amendment was submitted" or that the patentee could not have reasonably been expected to describe.  *Id.* at 741.  Thus, the court must determine the reasons for any amendments to ensure prosecution history estoppel is limited to amendments relating to patentability.  *Warner-Jenkinson*, 520 U.S. at 32-33.

Through the all elements rule and prosecution history estoppel courts are able to prevent infringers from making minor adjustments to the patent in a way that would avoid literal infringement, while ensuring that the public notice and definitional purposes of patents are served.  *Warner-Jenkinson*, 520 U.S. at 40.

### 4.  Comparison of the '553 Patent to the Defendants' Accused Devices

### a.  Literal Infringement of the '553 Patent

Plaintiff concedes that based on the inclusion of the word "wireless" in patent claims 1

and 22, there is no literal infringement.[4]  The Court finds no literal infringement as the '553 patent literally calls for wireless transmission and Defendants' devices can only transmit signals via wire.

b.  Doctrine of Equivalents Applied to the '553 Patent

While the doctrine of equivalents can be limited in two ways, in this case only the all elements rule is needed to show that the doctrine of equivalents is inapplicable.[5]  In particular, the specific exclusion principle supports a finding that wired transmission is not equivalent to wireless transmission.

As noted above, the scope of claims 1 and 22 is limited to wireless transmission. Wireless means *without* wires,[6] the opposite of which is *with* wires.  This limitation establishes a structural feature, namely the absence of wires.  The "specific exclusion principle" necessarily excludes its opposite – the presence of wires.  Just as the presence of "majority" could not be equivalent to "minority" in *Moore*, to allow wired transmission to be equivalent to wireless transmission would completely vitiate the element of wireless transmission.  The patent cannot be read so broadly as to cover an aspect specifically excluded from the scope of the claim by the

_____

[4] In its May 19, 2006 letter, Plaintiff alleges literal infringement based on the Notice of Allowability regarding Plaintiff's amended patent.  As discussed above, *supra* n.1, this argument is invalid as the amendment is still pending and, even if adopted, cannot be applied retroactively.

[5] Because the all elements rule is determinative, the Court need not address prosecution history estoppel.  Existence of one limitation is sufficient for a finding of non-infringement.  *See Freedman Seating*, 420 F.3d at 1358-59 n.4 (relying solely on the all elements rule in overruling the district court's finding of infringement and stating prosecution history estoppel was irrelevant).  Nonetheless it appears that prosecution history estoppel would also serve as a successful defense to infringement.  The amendments made during the application process were an effort by Plaintiff to distinguish itself from prior art by more clearly and thoroughly defining the invention.  It was in this process that wirelessly was added to the patent claims where the patent once only referred to a means for transmitting.  Plaintiff has not established that the amendments were unrelated to patentability.  Every detail added by Plaintiff distinguished the invention from prior art, which in the end made the invention patentable.

[6] *Webster's Third New International Dictionary* defines "wireless" as "having no wire or wires."  2624 (2002).

addition of the element wirelessly.  The patent only covers wireless transmission.  This court "has no right to enlarge a patent beyond the scope of its claims."  *Warner-Jenkinson*, 520 U.S. at 29.  It is illogical to find that wired is equivalent to its opposite – wireless.  Therefore, no reasonable juror could find that the difference between wired transmission and wireless transmission is insubstantial.[7]

In addition, to allow Plaintiff to broaden the patent beyond its actual scope and completely ignore an element of the claim would defy the public notice and definitional purposes of patents – the very reason for the limitations on the doctrine of equivalents.  Plaintiff was fully aware of the use of wires for transmission in karaoke machines and specifically chose to limit the scope of the patent by including the word "wirelessly" in order to overcome the PTO's rejections.  Wired transmission was not only foreseeable to Plaintiff, but it was also highlighted in the specification as a disadvantage of the pre-existing systems, which the patented device aimed to overcome.  Plaintiff had the opportunity to draft the patent in a way that would not exclude wired devices, but did not do so.  The Court cannot now broaden the scope of the claim to other forms of transmission given the specificity Plaintiff added to the patent claims.  *See Freedman Seating*, 420 F.3d at 1361 (holding that because patentee was aware of other types of mechanisms, but specifically chose to limit the claims to a particular type of mechanism, the district court

---

[7] Plaintiff cites *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004), for the proposition that wireless systems and wired systems can be considered equivalent.  (Pl.'s Mem. in Opp'n to Summ. J. 15)  However, Plaintiff mischaracterizes and overextends the comments made by the Federal Circuit in that case.  The passage cited by Plaintiff is actually a quote from an argument made by the patentees during the application process, not a comment by the court.  *See Golight*, 355 F.3d at 1333.  The only other reference to the comparison of wired and wireless in the opinion was also a quote from the patent prosecution stating that "[i]n making this rejection [to claim 16], the examiner took 'Official Notice of the equivalence of wireless remote control and hard wired controls for their use in the illumination art [at issue in the claim].'"  *Id.* at 1336.  The issue in *Golight* was whether the claim construction required the device to rotate through 360 degrees, not whether wireless and wired were equivalent.  *Id.* at 1330.

incorrectly vitiated the claim limitation by broadening the claim's scope beyond the specifically chosen mechanism); *see also Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997) ("[F]or a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly.  If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely.").  Aside from Plaintiff, the public must live with Plaintiff's claim and should therefore be allowed to rely upon the narrow language.  *See Freedman Seating*, 420 F.3d at 1361 ("As between the patentee who had a clear opportunity to negotiate broader claims, but did not do so and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure."); *see also CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. K.G.*, 224 F.3d 1308, 1318 (Fed. Cir. 2000) ("[C]ompetitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered . . . would make this right meaningless.").

Although the specific exclusion principle sufficiently shows the inapplicability of the doctrine of equivalents given the "all elements rule," this finding is further supported by the triple identity test.  This method of analysis focuses on "the *function* served by a particular claim element, the *way* that element serves that function, and the *result* thus obtained by that element." *Warner-Jenkinson*, 520 U.S. at 39.  By this test, an accused device must be substantially similar to the patent in terms of function, way, and result.  *See Graver Tank*, 339 U.S. at 608-09 ("[W]here a device is so far changed in principle from a patented article that it performs the same or similar function in a substantially different way . . . the doctrine of equivalents may be used to

restrict the claim and defeat the patentee's action for infringement."). Although the wires in the accused device may serve a similar function to the antenna in the patented device, as both the wire and the antenna send signals from the device to a receiver, the way in which the patent and the accused device achieve this function and the result are substantially different.

Plaintiff argues that the difference between wired and wireless is purely aesthetic and does not play a significant role in the device. For example, when pressed at oral argument, Plaintiff attempted to show the interchangeability between wireless and wired transmission by stating that cordless phones are equivalent to old-fashioned telephones. The Court is unpersuaded. Part of the novelty and inventiveness of the cordless phone is the ability to send signals through the air instead of through wires. Users no longer have to remain in one location, tied down by wires, in order to have phone service. It is absurd to think that cordless phones and old-fashioned telephones are the same technology and invention. Just as this argument fails with the relationship between cordless phones and old-fashioned telephones, the argument fails for the wireless and wired karaoke devices. To find that sending electrical energy through copper wire is substantially the same as sending electromagnetic energy through air is illogical. Different technology is required and different structures are used. Further, the Court will not rely on Plaintiff's expert, Henry L. Bertoni, who merely makes conclusory statements that wireless and wired devices are equivalent simply because wireless and wired versions of many products exist. *See Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court"). The existence of systems in wireless and wired forms does not necessarily make wireless and wired equivalent.

The devices also do not have substantially the same result. The patented device allows users to be mobile. As described by Plaintiff, the patented device can be used at a beach, in cars,

or walking down the street, and can transmit to multiple receivers. However, the accused device

is not mobile and can only transmit to a single receiver. Users are restricted to a single location

because the wires connecting the hand-held device to the receiver. The patented device was

developed to overcome some of the very disadvantages that the accused device continues to

have. The result of the technology used in these two devices is substantially different.[8]

Therefore, under the triple identity test, no reasonable juror could find that Plaintiff's

wireless device is equivalent to its opposite, a wired device.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

Furthermore, Plaintiff's Motion for Leave to File Letter Corroborating Information and

Argument of Record or, in the Alternative, for a Telephone or Court Continuation of the Oral

Argument is DENIED. The Clerk of Court is directed to enter judgment in favor of Defendants

and close this case.

SO ORDERED.

Dated:         August 30, 2006
               New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[8]Because the specific preclusion rule and triple identity test defeat Plaintiff's doctrine of
equivalents claim, the Court need not address prosecution history estoppel.

23

Service List:

Anthony H. Handal, Esq.
Brown Rudnick, LLP
7 Times Square
New York, NY 10036
*Counsel for Plaintiff*

Brain L. Wamsley, Esq.
Goodwin Procter, LLP
599 Lexington Ave
New York, NY 10022
*Counsel for Plaintiff*

Daniel P. Burke, Esq.
Galgano & Burke, LLP
300 Rabro Drive, Suite 135
Hauppauge, NY 11788
*Counsel for Defendants*

Georgia Damoulakis, Esq.
Galgano & Burke, LLP
300 Rabro Drive, Suite 135
Hauppauge, NY 11788
*Counsel for Defendants*